**UNITED STATES DISTRICT COURT
FOR THE WESTERN DIVISION DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

*FILED*

NOV – 8 2016

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

| | | |
|---|---|---|
| SEALED,<br>        Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>_____<br><br>**FILED *IN CAMERA*<br>AND UNDER SEAL**<br>**Pursuant to**<br>**31 U.S.C. §3730(b)(2)** |
| v. | §<br>§ | |
| SEALED,<br>        Defendants. | §<br>§<br>§ | |

# <u>FILED UNDER SEAL</u>

## <u>(ATTENTION SEAL CLERK)</u>

FILED

NOV - 8 2016

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *ex rel.* | § § § § | Civil Action No. _____ |
| JENNIFER NUESSNER and ROBERT HOFFMAN, | § § § | |
| Plaintiffs | § § | |
| v. | § § | |
| AUSTIN PAIN ASSOCIATES, LLC; DR. ROBERT WILLS; DR. BRANNON FRANK; DR. JOHN WAGES; TEXAS COMPOUNDING PHARMACY, LLC; VICTORY MEDICAL/VICTORY PHARMACY; and DR. WILLIAM FRANKLIN, | § § § § § § § § | FILED *IN CAMERA* AND UNDER SEAL  Pursuant to 31 USC §3730(b)(2) |
| Defendants | § § § | Demand for a Jury Trial |

**FALSE CLAIMS ACT COMPLAINT**
**OF THE UNITED STATES OF AMERICA AND THE STATE OF TEXAS, *ex rel.***
**JENNIFER NUESSNER AND ROBERT HOFFMAN**

**I.**
**INTRODUCTION**

1.      Relators Jennifer Nuessner and Robert Hoffman ("Relators") bring this

action on behalf of the United States of America ("U.S." or "federal government") and

the State of Texas ("Texas"), and on their own behalf (the U.S. and Texas may be

referred to jointly as the "government," and the U.S., Texas, and Relators may be referred

to collectively as "Plaintiffs"), against Defendants, Austin Pain Associates, LLC

("APA"); Dr. Robert Wills; Dr. Brannon Frank; Dr. John Wages; Texas Compounding

Pharmacy, LLC; Victory Medical/Victory Pharmacy; and Dr. William Franklin. (collectively, "Defendants").

2.     Plaintiffs seek treble damages, civil penalties, and other relief arising from Defendants' false claims made in violation of 31 U.S.C. §§3729 *et seq.* (the "federal False Claims Act" or the "FCA"), and Defendants' unlawful acts made in violation of the Texas Medicaid Fraud Prevention Act, Texas Human Resource Code §§36.001 *et seq.* (the "Texas Medicaid Fraud Prevention Act" or "TMFPA.").

3.     As a result of more than four and one-half years of employment by APA, Relator Jennifer Nuessner has personal knowledge that Defendants have committed fraud against the federal and state governments by submitting false claims and committing other unlawful acts with respect to the Medicaid, Medicare and TRICARE/CHAMPUS programs, and other federal government healthcare programs (sometimes collectively referred to herein as "Government Healthcare Programs").

4.     As a result of approximately twenty-one months of employment by APA, Relator Robert Hoffman also has personal knowledge that Defendants have committed fraud against the federal and state governments by submitting false claims and committing other unlawful acts with respect to the Medicaid, Medicare and TRICARE/CHAMPUS programs, and other federal government healthcare programs.

5.     The violations of the FCA and the TMFPA at issue result from the Defendants' submission of false claims to and other unlawful acts against the Texas Medicaid program (paid with both state and federal funds), the federal Medicare and Tricare/Champus programs, and other government healthcare programs (paid with federal

funds), based upon Defendants' fraud, false statements, false reports and false certifications to Texas and the U.S.

6.     As described more specifically below, Relators discovered in the course of their respective tenures at APA that APA was providing or receiving monetary and/or other remuneration intended to induce or reward referrals, in violation of the Anti-Kickback Statute (AKS). Defendants have wrongfully certified that they have complied with the Anti-Kickback Statute, thereby making all the claims they submitted to government healthcare programs false.

7.     Also as described more specifically below, APA and its physicians have submitted claims, or caused claims to be submitted, to government healthcare programs for sampling and laboratory analytical procedures, and other procedures, that were either not medically necessary, or not truly provided at all.

8.     On October 24, 2016, Relators served a Disclosure Statement and exhibits containing substantially all information in their possession regarding the facts alleged in this pleading on the Attorney General of the United States; the U.S. Attorney for the Western District and Assistant U.S. Attorney John LoCurto; and on the Texas Attorney General and Texas Assistant Attorney General Susan Miller.

## II.
## PARTIES

A.     Plaintiffs

9.     The United States and the State of Texas are the Plaintiffs on behalf of which the Relators bring this action pursuant to the FCA, 31 U.S.C. §§3730 *et seq.*, the TMFPA §§36.101 *et seq.*, and the LFCA §§46:439.1 *et seq.*

10.     Relator Jennifer Nuessner obtained a Master of Physician Assistant Studies from the University of North Texas Health Science Center in Fort Worth, Texas in 2007.  She was awarded a Master of Public Administration degree with Emphasis in Health Services Administration from Columbus State University in Columbus, Georgia in 1997. She received a Bachelor of Science degree in Biology in 1995 from Columbus College in Columbus, Georgia. She has been a member of the Texas Academy of Physician Assistants since 2004, the American Academy of Physician Assistants since 2004, the Texas Pain Society since 2011, the American Pain Society since 2011, the American Academy of Pain Management since 2011, and the Central Texas PA Society since 2011. She has been working in the area of pain medicine and treatment since 2011.

11.     Relator Robert Hoffman acquired a Bachelor of Nursing Science degree from Hardin-Simmons University in Abilene, Texas in 2009. He received a Masters of Nursing Science degree from Samford University in Birmingham, Alabama in 2011. He has been working in the area of pain medicine and treatment since February, 2010.

12.     Relators are former employees of APA who have direct and independent knowledge of the allegations set forth herein.

13.     After expressing their concerns with APA about various issues raised in this Complaint, APA did not make changes to prevent future problems of the same kind, nor were actions taken by Defendants to correct or remedy the detrimental impacts to the Government Healthcare Programs that had resulted previously. In time, APA fired both Relators.

4

B.    Defendants

14.    Austin Pain Associates, LLC is a clinical medical practice based in the Austin, Texas area. It is effectively a partnership of doctors, with Dr. Robert Wills as its founder. Since 2002, APA has grown to a practice consisting of 10 offices. In 2012, it acquired a laboratory.

15.    Dr. Robert Wills is a co-founder of APA. He graduated from the College of Natural Sciences at the University of Texas at Austin, and obtained his Medical Degree from The University of Texas Southwestern Medical School in Dallas, Texas. Dr. Wills completed a three-year surgical internship and residency at Parkland Hospital in Dallas, and completed his anesthesiology residency at Virginia Mason Medical Center in Seattle, Washington. He served as Chief Resident during his final year at Virginia Mason. According to an article in the Austin American-Statesman, Dr. Wills was among the highest Medicare billers in Central Texas for the year 2012, having been paid $1.6 million dollars by Medicare that year.

16.    Dr. Wills began practicing pain management and anesthesiology in Austin in 1996, and in May 2002 founded Austin Pain Associates. Since 2002, Dr. Wills has served as the group's President during which time APA grew from its single original location to now ten locations spread out among Williamson, Travis and Hays Counties, with ten physicians, multiple mid-level providers, a large behavioral health department, and several ancillary services.

17.    In addition to his work at APA, Dr. Wills has been involved with several other related business ventures. He co-founded Arise Healthcare System, LLC in 2008 and is the sitting Board President and Chief Medical Officer. In 2010 he co-founded

Medical Toxicology Laboratory Solutions, LLC and currently serves on the Board of Directors.

18.     According to information published on the Arise Healthcare website (http://www.arisehealthcare.com/about-us/team/), Dr. Wills is their Chief Medical Officer. He ostensibly also provides consultancy services, in which he focuses on developing and managing several ambulatory surgery centers. He played a role in the development and operation of medical start-up ventures, including physician-owned functional restoration programs, medical toxicology laboratories, and rapid anesthesia opioid detoxification programs. As described on the Arise Healthcare web site, Dr. Wills continues to work aggressively in the medical venture arena in his role as co-founder of Arise Healthcare.

19.     According to the biographical information published on the APA website (http://austinpainmanagement.com/doctor/8/), Dr. Wills has also personally spearheaded several real estate ventures. He has firsthand experience in the capital requirements necessary to get a medical start-up off the ground.

20.     Dr. Brannon Frank currently serves as the Medical Director for Austin Pain Associates. He graduated from Texas A&M University and received his medical degree from the University of Texas Medical Branch in Galveston, TX. He completed a fellowship in Interventional Pain Management and a residency in Anesthesiology at Emory University in Atlanta, GA. He is Board Certified in Pain Medicine by the American Board of Anesthesiology. Dr. Frank was formerly the medical director for Stonegate Surgery Center and President of the Austin Pain Society. According to an article in the Austin American-Statesman, Dr. Frank was also among the highest

Medicare billers in Central Texas for the year 2012, having been paid $1.5 million dollars by Medicare that year.

21.　　Like Dr. Wills, Dr. Frank is a principal at Arise Health Care. According to the Arise Health Care website (http://www.arisehealthcare.com/about-us/team/), Dr. Frank also has experience in the development of surgery center start-ups and ambulatory surgical center ("ASC") transactions involving third party acquisition. His ASC experience includes the syndication of new ASCs and re-syndication of existing ASCs. He also is involved with medical office real estate acquisition, development, and transaction.

22.　　Dr. John Wages is also a principal at APA. He received his medical degree and anesthesiology residency training from the Medical College of Georgia in Augusta. He continued his training through an interventional pain management fellowship at Wake Forest Baptist Medical Center and the Carolinas Pain Institute in Winston-Salem, North Carolina.

23.　　Texas Compounding Pharmacy is a currently inactive domestic limited liability company created in Texas on April 9, 2009. Its principal business location is the same location as that of Arise Healthcare, LLC, 5300 Bee Cave Road, Building 1, Suite 100, Austin, TX 78746. It also has locations at 3709 Promontory Point Dr., Austin, TX 78744, and 2924 Belgrave Falls Ln., Austin, TX 78748. Its members are Andres D. Ruiz (Pharmacist), Jason Fisher (Manager), Rene Garza (Manager), and Jared S. Leger (Manager, Member).

24.　　Victory Pharmacy is a compounding pharmacy owned by Victory Medical, which bills itself as Austin's home for traditional and holistic healthcare. It

7

began in 1996, founded by Dr. William Franklin in Oak Hill, Texas. Since then Victory Medical has grown to an 18,000 square foot facility based in South Austin and a new satellite office in Westlake, a suburb of Austin. Victory Medical Center is a group practice with one location, at 4303 Victory Drive, Austin, Texas. Currently, Victory Medical Center specializes in Family Medicine and Pain Management with 7 physicians.

25.    Dr. William Franklin is the founder, owner and Medical Director of Victory Medical.

### III.
### RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

26.    Defendants APA (including the APA Medical Toxicology Laboratory), Dr. Wills, Dr. Frank and Dr. Wages share common elements of management, finances, control, supervision, and reporting and thus are mutually, jointly, and severally liable under legal theories of *Respondeat Superior*, and the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of the claims laid out herein against them, they should be considered as a single business entity, and/or a joint enterprise in pursuing the schemes discussed herein. It is alleged that employees and officers of all these Defendants acted in harmony and concert to commit the unlawful acts made the basis of this Complaint.

### IV.
### JURISDICTION

27.    This action arises under the FCA, 31 U.S.C. §§3729 et seq., and the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1345.

28.     This Court also has supplemental jurisdiction over the claims brought by Relators on behalf themselves and on behalf of the State of Texas under the TMFPA, pursuant to 28 U.S.C. §1367(a) and 31 U.S.C. §3732(b).

## V.
## VENUE

29.     Venue in this district is proper pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b) and (c) since one or more of the Defendants transact business in this district and/or one or more of the acts at issue occurred in this district.

## VI.
## OVERVIEW OF GOVERNMENT HEALTHCARE PROGRAMS

A.   The Medicare Program

30.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4.  The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

31.     Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home healthcare. See 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program covers payment for physician services and

certain outpatient services that Part A does not cover. 42 U.S.C. §§ 1395j-1395w-6. The outpatient services provided by Defendants at their facilities are covered by Part B.

32.     CMS makes payments to Medicare-eligible providers for services they provide to Medicare-eligible patients after the services are rendered. Medicare enters into provider agreements with providers such as Defendants in order to establish the providers' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with providers to provide particular services for particular patients.

33.     For a medical service to be covered by Medicare, the service must be medically necessary and supported by documentation. (Title XVIII of the Social Security Act §1862(a)(1)(A) and §1833(g).)

34.     Medicare does not cover claims for physician services where there is an AKS violation involved in the underlying transaction. Claims submitted to federal healthcare programs where a kickback was offered, paid, solicited, or accepted are false under the FCA.

35.     Section 14 of the Medicare Enrollment Application applicable to clinics and practice groups informs applicants of the penalties for violating the False Claims Act and other federal laws.

36.     Section 15 of the Medicare Enrollment Application requires the supplier/provider to sign a certification requirement as a condition of participation as a Medicare provider that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law... and on the supplier's

compliance with all applicable conditions of participation in Medicare. *Id.* at 32. (Emphasis added.)

37.     When submitting a claim for payment by Medicare, the provider must use

Form CMS-1500. 42 C.F.R § 424.32. This form that includes a certification statement by

the provider, saying

> "…I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.
>
> For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.
>
> No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).
>
> NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.
>
> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

38.     Defendants have submitted or caused to be submitted false claims to

Medicare and other Government Healthcare Programs in violation of the FCA through

their illegal schemes: (1) the kickback scheme, and (2) the provision of unnecessary

medical services.

B.   The Medicaid Program

39.     The Medicaid program is a health insurance program for qualified

beneficiaries funded by federal and state taxpayer revenues enacted pursuant to Title XIX

of the Social Security Act. 42 U.S.C. §§ 1396-1396v. Each state is permitted to design its own medical assistance plan. 42 U.S.C. § 1396a.

40.     The Texas Health and Human Services Commission (HHSC) administers the Texas Medicaid program. Texas Medicaid & Health Partnership (TMHP) serves as the fiscal agent for the Texas Medicaid program. TMHP periodically issues a Texas Medicaid Provider Application, which includes the HHSC Medicaid Provider Agreement ("Medicaid Provider Agreement").

41.     The Medicaid Provider Agreement for Texas requires that, as a condition for participation in the Texas Medicaid program, a provider must agree to comply with all terms and conditions of the Provider Agreement, including but not limited to:

> 1.2.3   This Agreement is subject to all state and federal laws and regulations relating to fraud, abuse and waste in health care and the Medicaid program.

> 1.3.1 Provider agrees to submit claims for payment in accordance with billing guidelines and procedures promulgated by HHSC, or other appropriate payor, including electronic claims. Provider certifies that information submitted regarding claims or encounter data will be true, accurate, and complete, and that the Provider's records and documents are both accessible and validate the services and the need for services billed and represented as provided. Further, *Provider understands that any falsification or concealment of a material fact may be prosecuted under state and federal laws. . .* (Emphasis added.).

42.     When submitting a claim for payment by Medicaid, the provider must use Form CMS-1500. 42 C.F.R § 424.32. This form that includes a certification statement by the provider, saying

> "...I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

> For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by

his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

43.    Through their illegal schemes (the kickback scheme, and the provision of unnecessary medical services), Defendants have submitted or caused to be submitted false claims to the States' Medicaid programs in violation of the FCA and the State FCA.

C.    The TRICARE/CHAMPUS Program

44.    At all times relevant to this Complaint, APA and many of Defendants' patients were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), now known as Tricare ("Tricare/Champus").

45.    Tricare/Champus is a federal taxpayer-funded program that provides medical benefits to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees. Services at nonmilitary facilities are sometimes provided for active duty members of the armed forces, as well. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

46.     Humana   Military   Health   Services   ("Humana")   administers   the
Tricare/Champus   program   for   the   Tricare   South   Region,   which   includes   Texas
(excluding   the   El   Paso   area).   Humana   requires   providers   to   sign   a   Participation
Agreement as a condition of participation in Tricare/Champus.

47.     Among other things, the agreement mandates a provider "[t]o comply with
applicable provisions of 32 CFR 199 and related Tricare policy . . ." (Id. at 4) In addition
to the requirements in the Participation Agreement, a provider seeking reimbursement
from TRICARE/CHAMPUS for the costs of providing care to TRICARE/CHAMPUS
enrollees   is   required   to   submit   a   TRICARE/CHAMPUS   form,   that   requires   that   the
provider expressly certify that the information contained therein is accurate.

48.     Relators   believe   that   APA   submitted   Requests   for   Reimbursement   to
TRICARE/CHAMPUS that were based on their Medicare cost reports. Whenever these
reimbursement requests contained false or incorrect data or information, those Requests
for Reimbursement were also false.

49.     Defendants knew or recklessly disregarded the fact that their kickback
scheme and the provision of unnecessary medical services violated the FCA.

D.     Other Government Healthcare Programs

50.     The   Federal Employees Health Benefits Program ("FEHBP") provides
healthcare benefits for qualified federal employees and their dependents. It pays for
various services, including those at issue here. Other government healthcare programs
include   federal   prison   hospitals,   Indian   Health   Services,   Federal   Employees'
Compensation Act, Workers' Compensation Programs, Railroad Retirement Board, and
Veterans Administration. Together, these programs described herein, as well as all other

government-funded healthcare programs, will be referred to as "government healthcare programs".

51.     Reimbursement practices under all federally-funded government health care programs closely align with the rules and regulations governing Medicare reimbursement. Defendants knew or recklessly disregarded the fact that their kickback scheme and the provision of unnecessary medical services violated the FCA.

E.     The Anti-Kickback Statute

52.     The Anti-Kickback Statute ("AKS") prohibits the knowing and willful payment of remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by federal healthcare programs, including Medicaid, Medicare, Tricare/Champus, and other government healthcare programs. 42 USC §1320a–7b. The AKS prohibits both the offer and the payment of kickbacks – by those who offer or pay remuneration – and the solicitation or receipt of kickbacks – by those who solicit or receive remuneration. Compliance with the AKS is a condition of payment by Government Healthcare Programs.

53.     In pertinent part, the AKS provides:

> (b) Illegal remunerations
>
> > (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
> > > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > > (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a

felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

\* \* \*

(g) Kickbacks. In addition to the penalties provided for in this section or section 1128A [42 USCS § 1320a-7a], *a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code [the FCA]*.

42 U.S.C. § 1320a-7b (Emphasis added.)

Violation of the AKS can also subject the perpetrator to exclusion from participation in federal government healthcare programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

54.   The Anti-Kickback Act Statute is designed to, inter alia; ensure that patient care will not be improperly influenced by inappropriate compensation from the healthcare industry. Each of the federally-funded government healthcare programs requires every provider who seeks payment from the program to promise and ensure compliance with the provisions of the Anti-Kickback Act and other federal laws governing the provision of healthcare services in the United States. Any claim that

16

includes services resulting from a violation of the AKS, such as services by any health care provider to whom one or more the Defendants offered or paid kickbacks and/or the services provided by health care providers that resulted from kickbacks are false claims and other unlawful acts under the FCA and the State FCA.

55.     Payment of remuneration of any kind violates the AKS if even only one of multiple purposes for that remuneration was to induce referrals. Moreover, payments to physicians in return for the physicians' promises to send patients or referrals to a particular facility or provider qualify as kickbacks, as do payments made to induce physicians to send patients to particular facilities. Giving a person the opportunity to earn money may also constitute as an inducement under the Anti- Kickback Statute.

56.     The Anti-Kickback Statute provides certain "safe harbors" to exclude specified conduct from its ambit, as long as the involved parties have strictly complied with all the conditions of the safe harbor. However, parties to an arrangement cannot obtain safe harbor protection by entering into a sham contract that complies with the written agreement requirement of a safe harbor and appears, on paper, to meet all of the other safe harbor requirements, but does not reflect the actual arrangement between the parties.

57.     There is a safe harbor for personal service arrangements which requires, among other things, that:

> "The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs; and
> *****
> The aggregate services contracted for do not exceed those which are reasonably

necessary to accomplish the commercially reasonable business purpose of the services."

42 C.F.R. § 1001.952(d) (5), (7).

58.     The personal service arrangements and other financial agreements between the various Defendants involved are not protected by a safe harbor.

## VII.
## BACKGROUND

A.     Industry Standards For Pain Management Risk Assessment

59.     As a pain treatment clinic, APA prescribes opioids and other potentially addictive drugs and drugs that are amenable to unlawful use.

60.     Generally, medical practices that include the prescription of opioids for patient treatment must take steps to assure that patients are not addicted to drugs that treat pain, do not misuse or abuse drugs, and do not divert their prescribed medications to unlawful markets or uses.

61.     The challenge for a pain medicine practice is two-fold – 1) treat the pain, and 2) be alert for misuse and abuse of the drugs. According to the American Academy of Pain Medicine on Use of Opioids for the Treatment of Chronic Pain, guidelines for prescribing opioids should be an extension of the basic principles of good professional practice. Evaluation should initially include a pain history and assessment of the impact of pain on the patient, a directed physical examination, a review of previous diagnostic studies, a review of previous treatments, a drug history, and an assessment of coexisting diseases or conditions. When appropriate, the patient should undergo a baseline drug screening exam.

62.     There are a variety of drug screening exam tools available, essentially questionnaires, including:

> 1) The CAGE Questionnaire: (Brown, 1995)
>> a) Have you ever felt the need to cut down on your drinking or drug use?
>> b) Have people annoyed you by criticizing your drinking or drug use?
>> c) Have you ever felt bad or guilty about your drinking or drug use?
>> d) Have you ever needed an eye opener the first thing in the morning to settle your nerves?
>
> 2) Cyr-Wartman Screen: (Cyr, 1988)
>> a) Have you ever had a problem with alcohol (or drugs)?
>> b) When was your last drink (or drugs)?
>
> 3) Skinner Trauma Screen (Skinner, 1984) Since your 18th birthday, have you
>> a) Had any fractures or dislocations to your bones or joints?
>> b) Been injured in a road traffic accident?
>> c) Injured your head?
>> d) Been injured in an assault or fight (excluding injuries from sports)?
>> e) Been injured after drinking?
>
> 4) The Screener and Opioid Assessment for Patients with Pain ("SOAPP") (Akbik, 2006) A brief self-report measure to capture important information in order to identify which chronic pain patients may be at risk for problems with long-term opioid medications. The cutoff score has been found with a positive answer of 8 or higher. Five factors were identified on factor analysis labeled 1) history of substance abuse, 2) legal problems, 3) craving medication, 4) heavy smoking, and 5) mood swings.
>
> 5) Opioid Risk Tool ("ORT") (Kahan, 2006) A brief self-report tool that addresses five factors: (1) Family history of substance abuse; (2) Personal history of substance abuse; (3) Age (between 16 and 45 years); (4) History of preadolescent sexual abuse in females; & (5) Psychiatric history (ADD, OCD, bipolar, schizophrenia, and depression). The tool is gender specific. A history of an addiction disorder does not preclude a patient from being treated with opioids.

63.     Urine drug screens (UDS), also called urine drug tests (UDT) are commonly used tools in this area of practice. UDTs are performed qualitatively through immunoassay, or quantitatively using more refined laboratory analysis, either liquid chromatography/mass spectrometry or gas chromatography/mass spectrometry.

64.     Immunoassay findings are generally reported qualitatively as either positive (drug level above a pre-specified threshold) or negative (drug level below a pre-specified threshold). Raising or lowering the threshold thus changes the proportion of positive tests. A negative test is interpreted as a level below the threshold, and does not necessarily mean that the drug or metabolite is absent. Immunoassays generally have a rapid turnaround time, within minutes for on-site tests or in 1-4 hours for laboratory-based tests.

65.     Based on discussion at the APA office, Relators believe the cost to patients/insurers of a POC cup analysis was approximately $80.00 per urine sample tested.

66.     Light chromatography/mass spectrometry (LC/MS) or gas chromatography/mass spectrometry (GC/MS) are quantitative laboratory analytical procedures. (The APA internal guidance documents suggest that LC/MS is used at APA.) The tests are able to quantify the amount of drug or metabolite present in a urine sample. Quantitative tests can be used to confirm the presence of a specific drug identified by a screening test and can identify drugs that cannot be isolated by currently available immunoassays. Results are reported as the specific levels of substances detected in the urine. LC/MS generally requires specification of the drug or drugs to be identified. Alternatively, "broad spectrum screens" can be conducted. There is a several day turnaround time for LC/MS testing. By its nature, it is considerably more expensive than immunoassay.

67.     Relator Nuessner has seen bills from $1600 to $2200 per sample. The bills were itemized by molecule and for each molecule evaluated, the charge was $75, with at least 25-30 "molecules" being evaluated.

68.     The American Society of Interventional Pain Physicians (ASIPP) issued guidelines in 2012 on responsible opioid prescribing for chronic non-cancer pain. The guidelines include the following recommendations on urine drug testing:

- "Comprehensive assessment and documentation is recommended before initiating opioid therapy...
- Despite limited evidence for reliability and accuracy, screening for opioid use is recommended, as it will identify opioid abusers and reduce opioid abuse.
- Urine drug testing must be implemented from initiation along with subsequent adherence monitoring, in an in-office setting with immunoassay and confirmation for accuracy with chromatography in select cases, to identify patients who are non-compliant or abusing prescription drugs or illicit drugs, and urine drug testing may decrease prescription drug abuse or illicit drug use when patients are in chronic pain management therapy."

69.     The American College of Occupational and Environmental Medicine (ACOEM) issued guidelines in 2011 on the chronic use of opioids. Those guidelines contained the following recommendations on urine drug testing:

- "Routine use of urine drug screening for patients on chronic opioids is recommended as there is evidence that urine drug screens can identify aberrant opioid use and other substance use that otherwise is not apparent to the treating physician.
- Screening is recommended for all patients at baseline and then randomly at least twice and up to 4 times a year and at termination.
- Screening should also be performed 'for cause'..."

70.     In 2010, the Veteran's Affairs Department and Department of Defense convened a Management of Opioid Therapy (OT) for Chronic Pain Working Group. In

November 2011, the Working Group issued a Summary Guideline of its May 2010

"Clinical Practice Guidelines for Managing Opioid Therapy for Chronic Pain Treatment."

The recommendations on assessing adherence to prescribed opioids includes, with patient

consent, obtaining a urine drug test before initiating opioid therapy and randomly at

follow-up to confirm appropriate use. Other strategies recommended include clinical

assessment and screening aids such as random pill counts, adherence checklists and

standardized instruments such as the Screener and Opioid Assessment for Patients with

Pain (SOAPP). The guideline included the following specific recommendations regarding

urine drug testing:

- Inform patients that drug testing is a routine procedure for all patients starting or on opioid therapy, and is an important tool for monitoring the
- safety of their treatment.
- With patient consent, obtain a UDT in all patients prior to initiation of OT.
- With patient consent monitor all patients on OT with periodic random
- UDTs to confirm adherence to the treatment plan. Increase the frequency of UDTs based on risk level for aberrant drug-related behaviors and following each dose increase.
- Take into consideration a patient's refusal to take a UDT as part of the ongoing assessment of the patient's ability to adhere to the treatment plan and the level of risk for adverse outcomes.
- When interpreting UDT results, take into account other clinical information (e.g., past SUD, other risk factors, aberrant drug-related behaviors, and other conditions indicating risk.)
- Understanding of lab methods for drug testing and reporting are necessary to interpret UDT results (i.e., screen versus confirmatory test, substances tested, cut-off levels for tests). Maintain a close working relationship with the clinical laboratory to answer any questions about the UDT or for confirming the results.

71.     Texas, along with other state workers' compensation programs, follows to

some extent the Official Disability Guidelines - Treatment in Workers' Comp (ODG),

published by the Work Loss Data Institute. In May 2013, ODG guidelines regarding

UDT stated, "Quantitative urine drug testing is not recommended for verifying compliance without evidence of necessity."

72.     APA staff was consistently told that APA adhered to ODG Guidelines.

73.     Both Relators had ongoing concerns about the number of UDTs ordered at APA, as well as the number of POC cup tests that APA required to be confirmed by quantitative LC/MS laboratory analysis. In May 2013, Relator Nuessner communicated by email with a consultant retained by APA to keep APA aware and up-to date on the ODG guidelines. Relator Nuessner was told by the consultant that ODG Guidelines included the following points about UDT frequency:

- A point-of-contact (POC) immunoassay test is recommended prior to initiating chronic opioid therapy.
- There should be documentation of an addiction screening test using a formal screening survey in the records prior to initiating treatment. If the test is appropriate, confirmatory lab testing is not required.
- Frequency of urine drug testing should be based on documented evidence of risk stratification including use of a testing instrument.
- Patients at "low risk" of addiction/aberrant behavior should be tested within six months of initiation of therapy and on a yearly basis thereafter. There is no reason to perform confirmatory testing unless the test is inappropriate or there are unexpected results. If required, confirmatory testing should be for the questioned drugs only.
- Patients at "moderate risk" for addiction/aberrant behavior are recommended for point-of-contact screening 2 to 3 times a year with confirmatory testing for inappropriate or unexplained results. This includes patients undergoing prescribed opioid changes without success, patients with a stable addiction disorder, those patients in unstable and/or dysfunction social situations, and for those patients with comorbid psychiatric pathology.
- Patients at "high risk" of adverse outcomes may require testing as often as once per month. This category generally includes individuals with active substance abuse disorders.
- If a urine drug test is negative for the prescribed scheduled drug, confirmatory testing is strongly recommended for the questioned drug. If negative on confirmatory testing the prescriber should indicate if there is a valid reason for the observed negative test, or if the negative test suggests misuse or non-compliance. Additional monitoring is recommended including pill counts. Recommendations also include measures such as

prescribing fewer pills and/or fewer refills. A discussion of clinic policy and parameters in the patient's opioid agreement is recommended. Weaning or termination of opioid prescription should be considered in the absence of a valid explanation.

- If a urine drug test is positive for a non-prescribed scheduled drug or illicit drug, lab confirmation is strongly recommended. In addition, it is recommended to obtain prescription drug monitoring reports. If there is evidence of problems with cross-state border drug soliciting in your area, reports from surrounding states should be obtained if possible. Other options include contacting pharmacies and different providers (depending on the situation). Reiteration of an opioid agreement should occur. Weaning or termination of opioid prescription should be considered in the absence of a valid explanation.

- If unexpected results are found, documentation of the ensuing conversation, including patient's explanation should be made.

- Documentation should make evident the reason(s) that confirmatory tests are required. This includes information about the actual classes of drugs requested for testing.

- There should be specific documentation for the necessity of confirmatory testing of drug class panels such as antidepressants, benzodiazepines, acetaminophen and salicylates. Routine confirmatory screening of these classes of drugs is generally reserved for emergency department testing for overdose patients.

- Random collection is recommended.

- Quantitative urine drug testing is not recommended for verifying compliance without evidence of necessity. This is due in part to pharmacokinetic and pharmacodynamic issues including variability in volumes of distribution (muscle density) and inter-individual and intra-individual variability in drug metabolism. Any request for quantitative testing requires documentation that qualifies necessity. *Id.* (Emphasis added.)

B.   APA's Approach To Pain Management Risk Assessment

74.   When Relator Nuessner began working at APA in 2011, Point of Care (POC) Cup testing was used for initial UDS of new patients and ongoing UDS of current patients. POC Cup testing is an immunoassay methodology, a qualitative test in which a urine sample is collected in a cup and tested for the presence a threshold concentration of various drugs using test strips, in a manner similar to litmus paper being used to test for certain levels of pH in a liquid.

75.     At that time, it was not the practice of APA to confirm, for all patients, the results of POC Cup testing with follow-up analysis of the specimens using the more detailed LC/MS laboratory analytical procedure. Such confirmation was not determined to be medically necessary "across-the board" for all patients.

76.     Also, when Relator Nuessner began working at APA in 2011, APA had a written policy to guide practitioners when they determined whether patients fit a high, medium or low risk profile ("2011 Guidance"). That policy was issued on February 12, 2011.

77.     In February of 2012, APA purchased a laboratory that was located in the APA "South Office" on William Cannon Drive, in Austin, Texas.

78.     On April 12, 2012, APA revised its internal guidance for the determination of whether a specific patient should be classified as high, medium or low risk. The revised guidance document was entitled "Urine Drug Screen Policy and Procedure" ("2012 Guidance Document").

79.     Although not stated specifically in their guidance documents, after APA purchased the laboratory, APA adopted an across-the-board practice of requiring that the results of all immunoassays collected with POC Cups would be confirmed with a LC/MS laboratory analysis for the first 3 months that a patient was being treated by APA, without regard to the risk level assigned by the APA practitioners to each individual patient using the other screening methods employed during the evaluations undertaken for pain treatment.

80.     Soon the actual practice of APA became to require LC/MS confirmation of POC Cup immunoassay test results every 6 months for all patients, without regard to the risk level assigned by the APA practitioners to each individual patient.

81.     After the first 6 months of treatment, the practice of APA was to require LC/MS confirmation of POC Cup immunoassay test results for patients of moderate risk every 1 to 3 months, and for high-risk patients every 1 to 2 months.

82.     Later, POC Cup immunoassay analysis was abandoned for new patients, and soon thereafter for all patients, and only the more expensive LC/MS analysis was performed, with that analytical work performed by the APA laboratory acquired in February of 2012.

83.     A comparison of the 2011 APA Internal Guidance Document and the 2012 APA Internal Guidance Document reveals that APA was taking steps to instruct its practitioners to order LC/MS testing of more patient urine samples by creating more subjective standards for the determination of whether a patient should be classified as high, moderate or low risk.

84.     The 2012 APA Guidance for identifying a patient as "moderate risk" included the following changes:

- The following "Aberrant Behaviors," identifiable only by subjective, non-measurable criteria were added to the list.
  - significant probability of non-adherence to the prescribed medication regimen
  - history of poor adherence to Plan of Treatment in past twelve months (i.e. office visit no-shows, non-participation in multidisciplinary care), and
  - history of disruptive interaction with office and clinical staff (i.e. frequent phone calls, medication changes over the phone, frequently rescheduled office visits)

- There is no moderate Medical History risk level at all. If a patient's history is not low risk, then the Medical History risk is designated "high."
- There is also no moderate Patient Level risk level at all. Here, too, if a patient is not low risk, then the risk is designated "high."

85.     The APA UDS Ordering Clinical Decision Tree, updated on November 4, 2013, starts all patients on a Moderate Monitoring Level. Patients could not move to a Low Monitoring Level for the first 6 months of their treatment.

86.     APA's new standards pushed patients into higher risk levels using subjective criteria that is significantly different from the recommendations of the professional medical entities related to the practice of pain medicine.

87.     It did not take long to reach the point that some patients at APA were being drug screened, with LC/MS analysis, as frequently as every 2-3 days, others more commonly every week and even more common than that was every 2 weeks.

88.     APA's standards also differed from APA's practice as it existed before APA's acquisition of a laboratory, when APA's practice lined up much more closely with established industry recommendations.

89.     Relator Nuessner questioned Dr. Frank in a meeting with all providers (mid-level medical staff qualified to write treatment plans and recommend prescriptions for therapies and medications). She pointed out that all patients, even if they themselves had no history of aberrant behavior and no diagnosis of psychiatric instability, would be considered "high risk" if they had a family member diagnosed with depression. This, she argued, is essentially everyone, and it was very inappropriate to punish the patient for family history that had no demonstrable risk impact on the patient, and would result in

monthly UDS for the patient. Dr. Frank's response was to berate Relator Nuessner in front of the other providers for questioning him.

90.     Ultimately, APA might have had its staff go through the motions" of utilizing the evaluation strategy's highlighted in paragraphs 57, 58 and 66. It has decided to use a process of routine UDTs with a frequency that far exceeds the recommendations noted in paragraphs 64, 65, 67 and 70. It has ignored the important strategies recommended to address medication non-compliance identified in paragraph 70 (pill counts, prescribing fewer pills and/or fewer refills. weaning or termination of opioid prescriptions, obtaining prescription drug monitoring reports, contacting pharmacies and different providers, conversation with the patient). And it has created its own internal guidance to justify the number of urine samples it orders, drastically increasing its UDT orders.

91.     APA has also ignored all recommendations about the need for, and reasonable frequency of confirmatory analysis using the LC/MS analytical method.

C.     The APA Culture

92.     The APA working environment included consistent reminders to do everything possible to make billings as high as possible, without regard to the medical needs of their patients.

93.     Because of their financial interest in Arise Healthcare, Dr. Wills, Dr. Frank and Dr. Wages were constantly urging the APA medical staff to make referrals to Arise.

94.     Relator Hoffman once received an email from Dr. Wills about a patient having her procedure at the APA Ambulatory Surgical Center, which was the patient's

preference because of cost and convenience to her, instead of going to Arise to have the same procedure done. Dr. Wills' message was essentially that APA could get better reimbursement if the procedure was done at Arise and that APA couldn't continue to subsidize patient treatments if APA had better options. Notably, if Dr. Wills performed the procedure in the APA ASC, Medicare would cover it with little to no co-pay. If they went to an Arise ASC, the patient had to pay hundreds, possibly thousands, of dollars in co-insurance amounts.

95.     Relator Neussner had a patient, William Crawford, that needed his intra-thecal pain pump replaced. Based on co-payment/deductible considerations, the patient wanted to do it at the APA ASC where it would cost him nothing out of pocket, compared to a significant co-pay at Arise. Because the patient would not agree to do the procedure at Arise, Dr. Wills told Relator Neussner to cancel his procedure. Dr. Wills literally said, "This is an I scratch your back you scratch my back world, if he can't scratch my back a little he can go somewhere else for care."

96.     Dr. Wills, Dr. Frank, and Dr. Wages own Arise, which also owns a hospital in Austin, Texas.  These doctors regularly made referrals to Arise for surgical procedures.  The patients were "required" to have their surgical procedures there or the doctors would cancel the procedures altogether.

97.     Dr. Wills, Dr. Frank and Dr. Wages also referred their patients to Arise for physical therapy.  The patients were "required" to get physical therapy at Arise and only rarely could get referrals elsewhere.

98.     Dr. Wills, Dr. Frank and Dr. Wages also made referrals exclusively to the Arise Imaging Center for radiology work.

99.     The medical staff at APA were paid a base amount, which could be supplemented quarterly, based on how their work contributed to revenue generation at APA.   Each procedure that they ordered or performed could increase their annual income.

100.    The medical staff at APA was keenly aware of the preferences of the doctor-owners of APA regarding the ordering of procedures, and where those procedures should be performed, in order to maximize revenue generation.

101.    Another idiosyncrasy of the APA medical staff culture was the pervasive awareness of "good payers" and "bad payers." That is, the medical staff at APA had a good understanding about which health insurance providers would raise questions about paying for certain medical practices and procedures (or questions about the billed rate and/or frequency), and which insurers would not raise such questions. This knowledge informed the diagnostic process for the medical staff, because they generally knew the identities of payers for each of their patients. They had a very good understanding about whether APA could reliably expect to be paid what it billed for procedures and therapies that were ordered for each patient.

102.    Medicare, among other insurance providers, was viewed as a good payer. On the other hand, Medicaid and the Texas Workers Compensation program were viewed as bad payers.

103.    The culture at APA constantly reinforced the importance of revenue generation over the actual medical needs of APA patients or the medical necessity of the procedures that were ordered and performed.

## VIII.
## FACTUAL ALLEGATIONS

A.  Unnecessary Medical Services – Pain Management Lab Tests

104.    The predictable result of APA's changes to its risk level screening criteria and UDS Ordering Clinical Decision Tree was to place more patients in risk categories for which APA procedures would require more UDS testing overall, with correspondingly more quantitative testing being used to confirm results of qualitative testing. Many patients complained to Stacey Rosas (one of APA's most highly regarded Behavioral Health counselors) during their sessions with her, about the number of UDS and related costs.

105.    Although the earlier cited recommendations by a variety of respected pain management professional organizations never suggested UDS more often than 4 times per year, APA established criteria for itself that greatly exceeded that frequency, without regard to information that might have been collected for each patient using the other screening tools.

106.    Thus, APA used its unique criteria as a rationale to order more samples overall, more samples for analysis by its captive laboratory, and more samples for LC/MS analysis.   But the APA criteria didn't match the industry standard for establishing medical necessity for the number of UDS samples analyzed there, or for the number of samples analyzed using the expensive LC/MS method.

107.    Since ceasing to work for APA, both Relators have encountered a number of patients that they had treated while at APA. Often, without prompting, these patients would complain about the way APA requires so many UDS samples without giving adequate explanation to them about the need for so many samples. Usually,

31

those persons were being treated at a different clinic or pain medical practice after having left APA. Often, they would also point out that their current doctors did not require nearly so many UDS samples.

108.    One of Relator Nuessner's patients had been a patient of another pain practice (Dr. Owen) for 2 years before starting treatment at APA, and commented that her previous doctor never drug tested her more than once per year. This was a very trustworthy patient, with no history of aberrant behavior. Relator Nuessner trusted her and only tested her approximately every 3-5 months, because the patient has a bladder stimulator and cannot urinate. After Nuessner left APA, this patient told Relator Nuessner that APA started making her come in every 2 weeks to 1 month for UDS, which was nearly impossible for her. Because of APA's high demand for urine samples and her physical inability to provide urine for those samples, APA put her on high risk monitoring and required even more frequent testing. Finally, she left APA.

109.    The use of LC/MS analysis rather than the much less expensive immunoassay method would only be justified if the particular diagnostic evaluation for a specific patient required knowing the concentrations of specific drugs at a high degree of precision. The need for such precision was virtually never indicated in patient files.

110.    For any UDS sample analyzed using LC/MS rather than immunoassay, the cost difference ($80 per sample vs. $1800 to $2200 per sample) was not medically necessary.

111.    As of January 2015, APA was requiring mid-level providers to see 24 patients per day, 5 days per week.  (One mid-level, Leah Yturri, quit her job at APA because of this workload requirement.)

112.    With 20 APA providers (those who were not in surgery) seeing patients at this rate, Relators estimate that APA has approximately 120,000 patient visits per year. They were all expected to order UDS on virtually all patients every month. Conservatively, 10,000 UDS samples were analyzed per year using the LC/MS analytical method at a cost of at least $1600 per sample.

113.    Relators estimate that 90% of the patients they saw were labeled by the unique APA screening criteria as a high or moderate risk patient, but based on their own patients, Relators believe that only 30% merited consideration as a moderate or high risk patient.

114.    Even for patients whose moderate or high designation of risk seemed justified, monthly UDS rather than quarterly UDS tripled the costs.

115.    Considering unnecessary UDS and unnecessary LC/MS analysis, Relators believe that APA bills included many millions of dollars per year in unnecessary medical expenses.

B.    Unnecessary Medical Services – Hormone Panel Lab Tests

116.    Shortly after APA purchased the laboratory in February 2012, APA instituted a practice of ordering full hormone panels for analysis for all patients.  That is, APA practitioners were informed that "we are now able to do full hormone panel" and were directed to order laboratory analysis of the hormone levels for each patient.

117.    APA imposed a quota on its medical staff, requiring a full hormone panel to be ordered at least one time for each patient. APA practitioners that failed to order the hormone panel analysis received emails from Dr. Frank, pressuring them to order these tests.

118.    Initial "hormone training" was provided by APA, and APA used Dr. William Franklin, founder and Medical Director of Victory Medical as the trainer. During one training session, he was asked by an APA provider what APA would do with the information gathered or how APA medical staff would use the hormone information when treating APA patients, he replied that the APA providers would not actually use the hormone panel results, and that they would simply be referring patients out anyway.

119.    Relator Nuessner had been trained to read hormone panels while working at an OB/GYN practice during the 2007 to 2009 timeframe. Based on that training, she expressed to Dr. Wills and Dr. Frank that it is very complicated because certain ratios of hormones lead to different diagnoses. No medical service provider at APA had been taught to read hormone panels, but they were required had to order them and then deliver the results. When Relator Nuessner mentioned at a meeting that APA staff had not been trained appropriately, APA owners still did not offer training, and instead encouraged the APA providers to continue to order them with or without symptoms of fatigue, moodiness, sexual dysfunction, without regard to age, etc. APA owners also continuously emphasized the importance of making referrals to Dr. Franklin of Victory Medical after every hormone panel.

120.    However, a full hormone panel laboratory analysis was not and is not medically necessary information for pain management. The only hormone level that

might affect a medical diagnosis for pain management would be for testosterone, and that would not be necessary, or even useful, information for every single patient. For the patients whose pain management medical analysis might be usefully informed by testosterone level information, that information could often be acquired from the patients' general practitioners.

121.   Many APA practitioners, including Relators, questioned the reason for the directive to order this laboratory analysis.

122.   On one such occasion, Relator Nuessner challenged Dr. Frank in a meeting, questioning the need for, or relevance of, hormone testing to the treatment APA was providing to its patients. In response, Dr. Frank was extremely insulting to Relator and with great derision in the tone of his voice, said "you must see only 90-year old women out there in Cedar Park if you don't think every one of your patients needs a hormone panel." But he never answered the question.

123.   As a matter of practice, APA forwarded the results of the hormone panel analyses to the general practitioners who treated APA patients for issues other than pain management. After several months of such communiqués, so many GPs questioned why they were receiving this unrequested and unnecessary information from APA, that APA abandoned this practice.

124.   Given the way the program was initiated and used, none of the hormone panels ordered by APA were medically necessary.

125.   Another clear indicator that the hormone panels were not medically necessary is the fact that APA management made a decision that the hormone panels should not be ordered for Medicaid patients and Workers Compensation patients. The

governmental agencies running those programs were viewed as "bad" payers, and it was clear that they would refuse payment for the hormone panels.

126. However, Medicare, Tricare and private insurers were viewed as "good" payers. The APA staff received a great deal of pressure from APA owners to order the hormone labs for Medicare and Tricare patients, as well as the patients with private health insurance.

127. Based on prior experience, Relator Nuessner estimates that each hormone panel was billed at a charge of approximately $800. A hormone panel was ordered for every APA patient during a period of 7 months, at a rate of approximately 1000 per week. This would yield a total of $28 million, of which patients covered by the government healthcare providers would probably be 60 to 65%, likely generating approximately $7 million in revenue for APA. All of this was unnecessary medical expense.

C.      Unnecessary Medical Services – Behavioral Health Treatment

128. Some pain management patients can benefit from behavioral health therapy (BHT) as a supplement to medication. However, APA over-utilized this approach, resulting in many patients being required to attend BHT sessions at APA unnecessarily. This is evident from the very inconsistent process for deciding who should receive BHT.

129. Many patients were required to attend BHT after their very first visit. Ostensibly, the "prescription" for BHT was thus based on factors found in the patient's history. If a patient smoked cigarettes, a referral to the BHT Department at APA was very likely.

130.    Also notable was the difference among the APA doctors about the value of BHT as part of the pain management process.  Dr. Frank considered it very important and often complained when mid-level professionals did not refer his patients to BH. Dr. Wages was of a different persuasion and Dr. Wills was somewhere in the middle, apparently more concerned that patients might seek out a different pain management clinic if BHT was forced upon them.  It was well understood among APA staff that if a patient complained about the BHT requirement to Dr. Wills, that requirement would be overruled.  This could happen even if the patient displayed aberrant behaviors and had been prescribed multiple opioid prescriptions.

131.    It seemed that the real importance of BH was the revenue stream it generated.  All BHT had to be provided at APA.  Patients were not advised that BHT could be provided at other clinics or by other providers.

132.    If a patient failed to show up for a BHT appointment, the next medication prescription could be withheld until a make-up BHT appointment had been scheduled. But APA would not schedule BHT appointments on the same day that regular doctor appointments were made, because Medicare would only pay for one visit to APA per day, regardless of the number of treatments received by the patient on that day.

133.    The disparity of opinion and practice among the doctors at APA, without reference to facts pertinent to specific patients, is a clear signal that BHT was ordered for the sake of generating revenue, not because it was medically necessary.

134.    The patient files at APA do not include clear explanations that would justify referrals to BHT for any patient.

135.    Notwithstanding the lack of justification for requiring BHT, in March 2015, Dr. Frank was exhorting one of APA's behavioral therapists, Stacey Rosas, to increase the number of BHT sessions she had with her patients, from once per month to twice per month, or even once per week. However, Dr. Frank had no expertise to support such a demand.

136.    In August 2016, APA terminated Stacey Rosas' employment at APA because her services not lucrative enough.

137.    Although APA did use one or more of the screening tools recommended by industry experts, that information did not truly form the basis for referrals to BHT.

138.    Thus, none of the BHT required of APA patients was medically necessary.

139.    APA had 6 to 8 counselors on staff. They each saw 10 to 15 patients per day, 5 days per week. For 4,000 counseling sessions per year at a rate of $75 per session, APA would have charged $300,000 per year for unnecessary BHT.

D.    Unnecessary Medical Services/Medical Services Not Provided – Ultrasound Monitoring

140.    The APA doctors and medical staff performed some procedures (for example, the occipital nerve block procedure) using ultrasound monitoring. For APA, using ultrasound to guide the procedure results in a higher reimbursement from Medicare. The sonogram pictures captured by the ultrasound equipment must be retained by the treating physician, but need not be submitted with the claim. Using the ultrasound increases the payment. 78 FR 74251 See also, Ultrasound Guidance for Pain Management, December 10, 2013.

141.    In 2013, Dr. Wills instructed Relator Nuessner to use ultrasound. Ms. Nuessner responded that she did not know how to use it. Dr. Wills responded that he also

did not know how to use it, but they should all "use it" because of the higher Medicare reimbursement. Relator Nuessner had a similar discussion with Dr. Wills in 2011.

142. Relator Nuessner tried to use the ultrasound method 3 times before refusing any future use without training, because it was not helpful to the untrained eye and therefore pointless to use. Relator Nuessner had previously worked in an OB-GYN practice, where she was trained for months on how to use ultrasound to view fetal heartbeat and measure growth of a fetus, but she found that using it on a joint was a whole new skill for which none of the providers at APA were properly trained.

143. Some mid-level professionals at APA, including Jessica Horwath and Donna Teague, used ultrasound because APA had a pay structure that provided more money to its professional employees if their work had a greater positive revenue impact on APA. Horwath and Teague both used it on every knee and shoulder injection for a period of at least one year before APA staff were told to stop performing procedures in the office and instead refer the patients for whom those procedures were ordered to an APA doctor (who would then have them schedule in a surgery center). Horwath and Teague were likely doing this the most, probably totaling about 200 to 300 procedures during 2012 and 2013, performed without ever having formal training on how to use the equipment. Horwath and Teague encouraged Relator Nuessner to use it every time because it would bill higher and create more income for her at the end of the quarter.

E.    AKS Violations – Texas Compounding Pharmacy

144. During the 2011 to 2012 timeframe, staff at APA were instructed to inform their patients that all compound cream prescriptions were to be filled at Texas Compounding Pharmacy. Some patients disagreed with this instruction, because Texas

Compounding Pharmacy was not a drug provider on their health insurance plans. At this time, it was APA's practice that if patients refused to fill their prescriptions at Texas Compounding Pharmacy, APA would threaten to discontinue treatment.

145.    Dr. Wills, Dr. Frank, Dr. Wages, and one mid-level provider, Mary Jo Hart, received kickbacks for these referrals to Texas Compounding Pharmacy. They received checks directly from Texas Compounding Pharmacy. Relator Nuessner overheard conversations about these kickback checks. These conversations occurred at various times, and included APA staff members Mary Jo Hart, Donna Teague, and Jessica Horwath, as well as Dr. Wills, Dr. Frank and Dr. Wages. Relator Nuessner remembers hearing about this from Jessica Horwath, because Ms. Horwath was irate that she was not included among those who received checks from Texas Compounding Pharmacy. (Nancy Morgan, a now-retired APA employee, also heard such discussions, but is not believed to have received any of the bonus checks herself.)

146.    Relator Nuessner remembers being directly pressured to write prescriptions for compound creams (which cost approximately $2200 per prescription) so that the doctors would get a kickback. Dr. Wills told Relator Nuessner to "order a compound cream on everyone, it doesn't pay much but does help pad the pockets".

F.      AKS Violations – Victory Medical

147.    By 2013, APA's relationship with Texas Compounding Pharmacy ended and then Victory Medical Pharmacy (VMP) set up shop inside APA's South Office where the APA medical staff was instructed to tell their patients that every prescription written at the South Office (APA's main office) was to be filled at the "in house

pharmacy" owned by VMP regardless of whether APA's patients' health insurers would pay the entire amount at another pharmacy.

148.    Usually there were charges the patients complained about that resulted from using VMP, but all medications and compound creams were required per Dr. Wills to be filled at VMP for all patients at APA's South Office.

149.    At that time, there was a plan to open a branch of Victory Medical Pharmacy at APA's Cedar Park location, but it never came to fruition.

150.    The owners of APA intended for a reciprocal relationship to exist between Victory Medical and APA.

151.    Victory Medical was a provider of primary health care services and APA made referrals for those services (such as referrals for interpretation of hormone panel results) to Victory Medical.

152.    It was Dr. William Franklin of Victory Medical who provided the "hormone training" to APA staff when APA required its staff to order hormone panel testing for every APA patient.  APA staff were also required to send all hormone testing results to Dr. Franklin at Victory Medical for review and to refer their patients to Victory Medical for consultations regarding the hormone panel test results.

153.    APA did this intending that Victory Medical would refer pain patients to APA in return.   The intended scheme was that VMP would provide "exclusive" pharmacy services inside APA's locations, and Dr. Franklin was to interpret hormone panels for APA patients.  In turn, APA expected Victory Medical to use APA's lab for his own patients' hormone lab services and refer patients to APA for pain management. Apparently, Dr. Franklin was not using APA's lab exclusively and was not referring

41

many patients to APA or not referring to APA alone. So, APA ended the relationship with Dr. Franklin and VMP.

154.    APA's relationship with VMP ended abruptly.  Relators literally went to work one morning at the South Office and the pharmacy was gone.  APA staff was given no explanation, except that Dr. Franklin and Dr. Wills did not see eye to eye on something and VMP was out. The directives to refer APA patients to Victory Medical for various services, including prescriptions, also ceased at this time.

G.    Unnecessary Medical Services – Referrals to Arise Ambulatory Surgical Center

155.    When Relator Nuessner first began working at APA, it was common for patients to be treated with Trigger Point Injections (TPI) administered by a mid-level professional in the office. The procedure was not complicated and did not require sedation.  There was no issue about whether the TPI was medically necessary or whether the treating providers at that time were qualified to perform those procedures.  It is also clear that sedation was not viewed by APA as medically necessary for TPI.

156.    At that time, it was Dr. Wills' understanding that a sedation component associated with TPI was not eligible for reimbursement by Medicare. That is, Dr. Wills believed at the time that APA could claim reimbursement from Medicare for trigger point injections, but Medicare would not pay for the sedation. Ostensibly, he thought that Medicare had decided that sedation was determined not to be medically necessary at that time.

157.    In approximately January 2014, Dr. Wills learned that Medicare would reimburse providers for TPI performed under sedation.  APA's policy changed dramatically once Dr. Wills learned that APA could be reimbursed for sedation.

Thereafter, APA mid-levels were instructed to order all TPI's to be done under sedation, which is a surgical procedure. This required that the TPIs that were once performed in the office would be performed in a surgical setting, resulting in referrals to an Arise Ambulatory Surgical Center (Arise ASC).

158.    Procedures done this way could generate Medicare revenue, but using sedation was clearly not medically necessary.

## IX.
## COUNTS AGAINST DEFENDANTS

**Count 1:**     **Violations of the FCA by All Defendants (pursuant to 31 U.S.C. 3729(a)(1) and 31 U.S.C. 3729(a)(2) [for violations before June 7, 2008] and pursuant to 31 U.S.C. 3729(a)(1)(A), 31 U.S.C. 3729(a)(1)(B), 31 U.S.C. 3729(a)(1)(C) and 31 U.S.C. 3729(a)(1)(G) [for violations on or after June 7, 2008]**

159.    Relators, acting in the name of and on behalf of the United States and themselves, re-allege and incorporate by reference the allegations in the preceding paragraphs of this Complaint.

160.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§3729 *et seq.,* as amended.

161.    By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, to officers, employees or agents of the United States under the Government Healthcare Programs, false claims for payment or approval, and made, used and caused to be made and used false records and statements material to false claims as a result of their kickback scheme, their provision of unnecessary medical services, their improper billing for services not provided, as described herein.

162.    Prior to June 7, 2008, Defendants violated the FCA in the following respects:

43

a.      knowingly presenting, or causing to be presented to an officer or employee of the United States Government a false or fraudulent claim for payment or approval by Government Healthcare Programs, in violation of Section 3729(a)(1) of the FCA; and

b.      knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by Government Healthcare Programs, in violation of Section 3729(a)(2).

163.    On or after June 7, 2008, Defendants violated the FCA in the following respects:

c.      knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval by government healthcare programs, in violation of Section 3729(a)(1)(A) of the FCA; and

d.      knowingly making, used, or causing to be made or used, false records or statements material to false or fraudulent claims to government healthcare programs, in violation of Section 3729(a)(1)(B) of the FCA; and

e.      conspiring to commit a violation of Sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(A)(G), in violation of Section 3729(a)(1)(C) of the FCA; and

f.      knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, in violation of Section 3729(a)(1)(G) of the FCA.

**Count 2:**    **Violations of the Anti-Kickback Statute, 42 U.S.C. §1320a-7b, Against All Defendants**

164.    Relators, acting in the name of and on behalf of the United States and themselves, re-allege and incorporate by reference the allegations in the preceding paragraphs of this Complaint.

165.    The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. §1320a-7b, provides criminal penalties of up to $25,000 or five years in jail or both for violations of the Anti-Kickback Statute.  42 U.S.C. §1320a-7b(b).

166.    Each claim for reimbursement for Defendants' services represents a false claim for payment because each such claim carried with it a false certification by the healthcare provider that the service it provided complied with the Anti-Kickback Statute.

167.    Defendants have violated the Anti-Kickback Statute by soliciting and implementing programs that provided a direct and substantial financial incentive to induce referrals of patients to and from Texas Compounding Pharmacy, LLC and Victory Medical/Victory Pharmacy.

168.    Unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants and in reliance on the truthfulness and accuracy of Defendants' certifications, the United States paid and continues to pay on the claims that would not be paid but for Defendants' wrongful actions and omissions.

169.    As violations of the Anti-Kickback Statute, these material misrepresentations made by Defendants constitute false claims and statements under 31 U.S.C. §3729 *et seq.* pursuant to 42 U.S.C. §1320a-7b(g).

**Count 3:    Violations of the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE §§36.001 *et seq.*, Against All Defendants**

170.    Relators restates and re-allege the allegations contained in preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

171. This is a *qui tam* action brought by Relators on behalf of the State of Texas to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE §§36.001 *et seq.*

172. TEX. HUM. RES. CODE §36.002, in part, provides liability for any person who has violated the TMFPA in the following respects:

> **a.** knowingly made or caused to be made false statements or misrepresentations of material facts to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of §36.002(1);
>
> **b.** knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of §36.002(2); and
>
> **c.** knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:
>
> > (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;
>
> in violation of §36.002(4); and
>
> **d.** except as authorized under the Medicaid program, knowingly paid, charged, solicited, accepted, or received, in addition to amounts paid under the Medicaid program, gifts, money, donations, or other consideration as conditions to the provision of services or products or the continued provision of services or products if the cost of the services or products is paid for, in whole or in part, under the Medicaid program, in violation of §36.002(5); and
>
> **e.** knowingly made or caused to be made a claim under the Medicaid program for:
>
> > (B) a service or product that was substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; in violation of §36.002(7); and

46

**f.**   conspired to commit a violation of Subdivision (1), (2), (4), (5), (7), (12), or (13) of §36.002, in violation of §36.002(9); and

**g.**   knowingly made, used, or caused the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to this state under the Medicaid program, in violation of §36.002(12); and

**h.**   knowingly engages in conduct that constitutes a violation under Section 32.039(b).

173.   TEX. HUM. RES. CODE §32.039(b)(1-b), in part, provides liability for any person who:

offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program[.]

174.   Defendants violated TEX. HUM. RES. CODE §36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by their violations of Federal and State law as a result of providing unnecessary medical services, and improper billing for services not provided, as described herein.

175.   Defendants violated TEX. HUM. RES. CODE §36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by their violations of Federal and State laws, including but not limited to TEX. HUM. RES. CODE §32.039(b).

176.   The State of Texas, by and through the Texas Medicaid program and other State health care programs, was unaware of Defendants' wrongful and illegal practices and paid the claims submitted by health care providers in connection therewith.

177.    Compliance with applicable Medicare, Medicaid and various other Federal and State laws was an implied and also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' wrongful and illegal practices.

178.    Had the State of Texas known that Defendants violated the laws cited herein, it would not have paid the claims submitted by healthcare providers in connection with Defendants' wrongful and illegal practices.

179.    As a result of Defendants' violations of TEX. HUM. RES. CODE §36.002, the State of Texas has been damaged.

180.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to TEX. HUM. RES. CODE §36.101 on behalf of themselves and the State of Texas.

181.    This Court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same facts as the federal claim, and merely asserts separate damages to the State of Texas in the operation of its Medicaid program.

## X.
## PRAYERS FOR RELIEF

### A.    Prayer as to Count 1

182.    Relators pray that this Court enter judgment on behalf of the United States and Relators, and against Defendants in Count 1, as follows:

    a.    An award to the United States of three (3) times the actual damages suffered by the United States as a result of each Defendant's conduct, as provided by §3729(a)(1) of the FCA;

    b.    An award to the United States against each Defendant, respectively, of not less than $5500 and not more than $11,000 for

each violation that occurred on or before November 2, 2015, and not less than $10,781 and now more than $21,563 for violations occurring after November 2, 2015, as provided by §3729(a)(1) of the FCA;

c.    An award of pre-judgment and post-judgment interest, as appropriate, at the highest rate allowed by law;

d.    An award to Relator of a fair and reasonable relator's share to which the Relator are entitled under 31 U.S.C. §3730(d);

e.    An award to Relator of all costs and expenses of this litigation, including statutory attorneys' fees and costs of court pursuant to §3729(a)(3) and §3730(d)(1) of the FCA; and

f.    All other relief on behalf of the Relator and the United States Government to which they may be justly entitled, under law or in equity, which the District Court deems just and proper.

## B.    <u>Prayer as to Count 2</u>

183.    Relator prays that this Court enter judgment on behalf of the United States and Relator, and against Defendants in Count 2, as follows:

a.    An award to the United States of three (3) times the actual damages suffered by the United States as a result of each Defendant's conduct, as provided by §3729(a)(1) of the FCA;

b.    An award to the United States against each Defendant, respectively, of not less than $5500 and not more than $11,000 for each violation that occurred on or before November 2, 2015, and not less than $10,781 and now more than $21,563 for violations occurring after November 2, 2015, as provided by §3729(a)(1) of the FCA;

c.    An award of pre-judgment and post-judgment interest, as appropriate, at the highest rate allowed by law;

d.    An award to Relator of a fair and reasonable relator's share to which the Relator are entitled under 31 U.S.C. §3730(b);

e.    An award to Relator of all costs and expenses of this litigation, including statutory attorneys' fees and costs of court pursuant to §3729(a)(3) of the FCA; and

f.    All other relief on behalf of the Relator and the United States Government to which they may be justly entitled, under law or in equity, which the District Court deems just and proper.

## C.   **Prayer as to Count 3**

184.   Relator respectfully requests this Court to award the following damages to the following parties and against Defendants on Count 3:

a.    To the State of Texas:

(1)   The amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

(2)   Interest on the amount of the payment or the value of the benefit described by a (1) at the prejudgment interest rate in effect on the day the payment was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3)   Two times the amount of the payment or the value of the benefit described by above in a (1); and

(4)   Fees, expenses, and costs reasonably incurred by the State of Texas, including court costs, reasonable attorney's fees, witness fees, and deposition fees;

b.    To RELATOR JENNIFER NUESSNER and ROBERT HOFFMANS:

(1)   A fair and reasonable amount allowed pursuant to Tex. Hum. Res. Code §36.110, and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action, as allowed by Tex. Hum. Res. Code §36.110;

(3)   An award of statutory attorneys' fees and costs, as allowed by Tex. Hum. Res. Code §36.110; and

(4)   Such further relief as this Court deems equitable and just.

## XII.
## JURY DEMAND

185.   Relators request a trial by jury of all issues so triable.

Respectfully submitted,

Patrick J. O'Connell
Texas Bar No. 15179900
Jan Soifer
Texas Bar No. 18824530
Jim Haley
Texas Bar No. 08739500

O'Connell & Soifer, LLP
2525 Wallingwood Drive
Bldg. 14
Austin, Texas  78746
(512) 852-5918 (phone)
(512) 222-0422 (fax)
poconnell@oconnellsoifer.com
jsoifer@oconnellsoifer.com
jhaley@oconnellsoifer.com

Attorneys for Relators
JENNIFER NUESSNER and ROBERT
HOFFMAN

JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SEALED

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Patrick J. O'Connell, O'Connell & Soifer LLP, 2525 Wallingwood Dr.,
Bldg. 14, Austin, TX 78746; (512) 852-5918;
poconnell@oconnellsoifer.com

## DEFENDANTS

SEALED

County of Residence of First Listed Defendant   Travis
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS

☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY

☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### IMMIGRATION

☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS

☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

☐ 375 False Claims Act
☒ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C Sec. 3729 et seq.
Brief description of cause:
Federal False Claims Act case with pendent Texas Medicaid Frad Prevention Act claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
11/04/2016

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____